[This opinion has been published in *Ohio Official Reports* at 72 Ohio St.3d 150.]

AMERICAN NATIONAL CAN COMPANY, APPELLEE *v.* TRACY, TAX COMMR.,
APPELLANT.

[Cite as *Am. Natl. Can Co. v. Tracy*, 1995-Ohio-42.]

*Taxation—Sales and use taxes—Production and sales of plastic bottles—Machine*
*hoppers that hold raw material are preliminary to manufacturing and are*
*subject to tax—Case erectors which produce cardboard containers are*
*subject to tax—Water cooling system which cools equipment during*
*processing are not subject to tax due to its adjunctive use—Electrical*
*transforming substation not affixed to concrete slab upon which it rested*
*and which could be moved with a crane is not real property and thus is*
*subject to tax.*

(No. 94-595—Submitted November 4, 1994—Decided May 10, 1995.)

APPEAL from the Board of Tax Appeals, No. 91-Z-718.

————————

{¶ 1} The Tax Commissioner appeals the decision of the Board of Tax
Appeals ("BTA") exempting from Ohio sales and use taxes the machine hoppers,
case erectors, water chiller cooling system, and electrical transforming substation
purchased and used by appellee, American National Can Company ("Am-Nat") at
its Bellevue, Ohio plant, during the audit period October 1, 1985 through December
31, 1987.

{¶ 2} Am-Nat produces and sells plastic bottles which are packed in
cardboard containers for shipment to its customers. A separate extruder is used to
produce each of the six layers of the plastic bottles. Five layers are made of
polyproplyene, adhesive, or ethyl vinyl alcohol. The sixth is made of "regrind."
The basic material for each layer is resin, which is pumped from storage tanks into
machine hoppers located at, and above, the extruders. As raw material is needed

for production of plastic bottles, it is gravity-fed into an extruder. The raw material is heated to four hundred degrees within the extruder and becomes molten. It then flows through a two-foot flow-tube to the extruder head and is formed into six-layer "straws." The straws are introduced into rotating molds, where inserted needles inject compressed air, shaping the bottles. Am-Nat's water cooling system circulates water through the molds to cool the bottles and produce the necessary crystallization process. Excess material, "regrind," is then trimmed from the bases and the necks of the bottles and recirculated into production to become one of the six layers.

{¶ 3} The case erectors, carton-forming machines, produce cardboard containers. After forming, the containers are conveyed to the "pack station," where the bottles are placed manually into them.

{¶ 4} Am-Nat's electrical transforming substation consists of a seven foot by seven foot by nine foot electrical transformer resting on a seven foot by nine foot by two foot thick concrete slab, buried in the ground; two forty-two foot tall telephones poles and two twenty-foot tall telephone poles sunk seven to nine feet into the ground; three tiers of wood cross-members attached to the telephone poles by bolts; electrical equipment, including insulators, fuses and capacitors bolted to the cross-members and connected to the transformer by wiring; and a chain-link fence surrounding the concrete slab.

{¶ 5} The commissioner assessed sales and use taxes on Am-Nat's purchases and use of the machine hoppers, case erectors, water chiller cooling system, and electrical transforming substation.

{¶ 6} Upon appeal, the BTA reversed the order of the commissioner as to each of these items.

{¶ 7} The cause is now before this court upon an appeal as of right.

_____

*Bricker & Eckler* and *Mark A. Engel*, for appellees.

*Betty D. Montgomery*, Attorney General, and *Lawrence D. Pratt*, Assistant Attorney General, for appellant.

_____

*Per Curiam.*

{¶ 8} The seminal question as to the taxability of the machine hoppers turns on whether this equipment constitutes an "adjunct" to direct use during the manufacturing or processing period and therefore is exempt from taxation under R.C. 5739.01(E)(2) and 5739.01(R). In *Ball Corp, v. Limbach* (1992), 62 Ohio St.3d 474, 478, 584 N.E.2d 679, 682, we quoted *Canton Malleable Iron Co. v. Porterfield* (1972), 30 Ohio St.2d 163, 170, 59 O.O.2d 178, 181-182, 283 N.E.2d 434, 439:

"'[M]anufacturing and processing '" * * * imply essentially a transformation or conversion of material or things into a different state or form from that in which they originally existed -- the actual operation incident to changing them into marketable products.'" * * *'" We said in *Ball*, as we say here, that the manufacturer "did not sell" the raw material or "regrind pellets; it sold bottles in partitioned cartons." *Id*.

"The test for determining the exemption from taxation of equipment by reason of its status as adjunct under former R.C. 5739.01(S), later codified at (R), is * * * '"that the thing sought to be excepted from taxation be (1) an adjunct, (2) used at the same location, and (3) used after the transformation or conversion has commenced. Subsection (E)(2) adds the additional requirement that the thing be adjunct to *direct* use or consumption." * * *'" (Emphasis *sic*.) *Id*. at 478, 584 N.E.2d at 682-683.

{¶ 9} A fact pattern strikingly similar to *Ball* exists here. Raw material is maintained at locations near the extruders. The actual manufacturing or processing of Am-Nat's product occurs in the extruder when the form or state of the raw material is changed, ultimately resulting in the saleable product. The machine

hoppers that hold the raw material are *preliminary* to manufacturing and are, thus, not adjuncts, and are subject to tax. Thus, we reverse the decision of the BTA as to the machine hoppers.

{¶ 10} Regarding the case erectors, Am-Nat's attempt to extend the scope of the exemption for material used in packaging tangible personal property produced for sale cannot succeed. "We agree with the commissioner's construction of R.C. 5739.02(B)(15). To be excepted from taxation * * * equipment must be used in placing tangible personal property produced for sale in packages." *Hawthorn Mellody, Inc. v. Lindley* (1982), 65 Ohio St.2d 47, 52, 19 O.O.3d 234, 238, 417 N.E.2d 1257, 1261.

{¶ 11} Am-Nat concedes that the actual placing of the finished product in the shipping containers is done manually. In *Ball*, "[t]he Tax Commissioner contest[ed] the exception of the * * * carton-forming system * * *. R.C. 5739.02(B)(15) provides an exception for machinery and equipment used in 'packaging.' She urge[d] that exception be denied because only machinery and equipment used 'in placing the item for sale in the packages' qualifies. She contend[ed] that the BTA erred in extending the exception to machinery or equipment which is neither packaging machinery or equipment, nor an integral part of packaging machinery or equipment." *Id.* at 479, 584 N.E.2d at 683. The court held that "[e]xceptions from taxation are to be strictly construed" and that "'[t]o be excepted from taxation under R.C. 5739.02(B)(15), machinery or equipment must be used in placing tangible personal property produced for sale in packages.'" *Id.* Thus, we reverse the BTA's decision as to the case erectors.

{¶ 12} Although there is a factual dispute regarding the function of Am-Nat's water cooling system, and even as to the number of water cooling systems Am-Nat uses, the BTA found as a fact that "* ** the system should be looked at as a whole, and due to its adjunctive use, not assessed tax. The two systems work

essentially as a single system to accomplish the manufacturing function of cooling equipment during processing."

{¶ 13} The BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations, we will affirm. *R.R.Z. Assoc. v. Cuyahoga Cty. Bd. of Revision* (1988), 38 Ohio St.3d 198, 201, 527 N.E.2d 874, 877. Since the record contains such evidence, we affirm the BTA's decision as to the water cooling system.

{¶ 14} Finally, regarding the electrical transforming substation, the commissioner contests only the taxability of the transformer. The test for exemption is to determine whether the transformer is a structure attached to the land. R.C. 5739.01(B)(5). If it is attached, it becomes real property and is exempt from sales and use taxes; if it is not attached, it remains personal property subject to taxation.

{¶ 15} To qualify for exemption under R.C. 5739.01(B)(5), the transformer must be "'incorporated into a structure or improvement on and becoming a part of real property.'" See *Rotek, Inc. v. Limbach* (1990), 50 Ohio St.3d 81, 82, 552 N.E.2d 640, 641. As defined in R.C. 5701.02, "real property" "include[s] land itself * * * and unless otherwise specified, all buildings, structures, improvements, and fixtures of whatever kind on the land."

{¶ 16} "[T]he term 'incorporation,' as used in R.C. 5739.02(B)(13), requires physical affixation to the relevant improvement. * * * We perceive no basis for excluding such requirement from the term 'incorporated' as used in the construction contract provision found in R.C. 5739.01(B)." *Botkins Grain & Feed Co. v. Lindley* (1982), 1 Ohio St. 3d 64, 68, 437 N.E.2d 1182, 1185-1186.

{¶ 17} The record shows that this transformer, a large piece of equipment, was neither bolted nor otherwise affixed to the concrete slab upon which it rested. Am-Nat admits that it could be moved with a crane. It was, therefore, free-standing and not a structure or part of real property.

**{¶ 18}** The BTA's failure to find that the transformer was not incorporated into the real property was unreasonable and unlawful, and its decision in this respect is reversed.

**{¶ 19}** The decision of the BTA is affirmed in part and reversed in part.

*Decision affirmed in part*

*and reversed in part.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

WRIGHT and PFEIFER, JJ., concur in part and dissent in part.

_____

**WRIGHT, J., concurring in part and dissenting in part.**

**{¶ 20}** I concur in the court's conclusion that the water cooling system is exempt from taxation. I dissent to the conclusion that the machine hoppers, case erectors, and electrical transformer are not similarly exempt.

I

**{¶ 21}** The majority relies upon an erroneous interpretation of *Ball Corp. v. Limbach* (1992), 62 Ohio St.3d 474, 584 N.E.2d 679, to reach the conclusion that the machine hoppers do not qualify for the adjunct exemption. In fact, the taxability of machine hoppers was not before this court in *Ball*.

**{¶ 22}** In *Ball*, the Board of Tax Appeals ("BTA") determined that manufacturing began at the co-extrusion machines and that the hoppers were exempt as adjunct to the co-extrusion machines. The BTA then denied an exemption for the raw material handling system, which included vacuum tubes, silos and storage bins, because the system was both preliminary to manufacturing and not adjunct to machinery "directly used" in manufacturing. Only the BTA's decision denying an exemption for the raw material handling system was appealed by Ball Corp., and this court affirmed: "With regard to the appeal of Ball Corp., the decision of the BTA which denied exception for the raw material handling and processing system is reasonable and lawful and is affirmed." *Id.* at 479, 548 N.E.2d

at 683. The decision of the BTA granting an exemption for the machine hoppers was left undisturbed, and properly so.

{¶ 23} Our cases have consistently held that machinery, similar to the machine hoppers at issue in this case, which directly feeds manufacturing equipment is adjunct to that equipment and therefore exempt from sales and use taxes. In *Bird & Son, Inc. v. Limbach* (1989), 45 Ohio St.3d 76, 82, 543 N.E.2d 1161, 1167, we held: "Inasmuch as the machine bins supply the blender box with granules, it would appear that such items are 'adjuncts' to a direct use as contemplated by former R.C. 5739.01(S) and our decision[s] in *Canton Malleable* and *Hawthorn Mellody*, *supra*. Accordingly, it is our further determination that equipment utilized to provide an immediate supply of raw materials to machinery employed directly in the production of personal property is an adjunct used during and in the production of a product and necessary to carry on and continue that production. Such equipment is therefore subject to exemption from sales and use taxation pursuant to former R.C. 5739.01(S)."

{¶ 24} Even though the machine hoppers are "preliminary" to the manufacturing process, in that they feed raw material to the extruders where the manufacturing process actually begins, they may still qualify for the adjunct exception under R.C. 5739.01(R). That was the exact result reached in *OAMCO v. Lindley* (1986), 24 Ohio St.3d 124, 125, 24 OBR 347, 348, 493 N.E.2d 1345, 1347: "A precise mixing system composed of various small conveyor belts regulates the flow of aggregate, from the bins. The result is a uniform size and weight of aggregate which is essential to the required standardization of product. *** Without these pieces of equipment, there could be no mix specifications, nor constancy of finished product. Without doubt, they are 'adjuncts used during and in, and necessary to carry on and continue, production.'"

{¶ 25} The testimony before the BTA revealed that the machine hoppers performed the necessary task of carefully controlling the flow of resin into the

extruders so that the extruders operated properly in creating a salable product. This testimony, combined with our decisions in *Bird & Son*, *supra*, and *OAMCO*, *supra*, leads to the conclusion that the machine hoppers qualify for the adjunct exemption under R.C. 5739.01(R).

## II

**{¶ 26}** The majority also errs in finding that the case erectors do not qualify for an exemption under R.C. 5739.02(B)(15). Specifically, the majority reads our opinion in *Ball*, *supra*, as requiring that a packaging line must be fully automated, with no manual placement of products into the prepared packages, to qualify for an exemption under R.C. 5739.02(B)(15). That interpretation is not only inconsistent with our previous cases, but it will also have the anomalous result of providing a disincentive for Ohio manufactures to employ Ohio workers in the packaging process.

**{¶ 27}** R.C. 5739.02(B)(15) provides an exemption for "machinery, equipment, and material for use in packaging tangible personal property produced for sale ***, or sold at retail." As defined by the statute, "packaging" involves placing items in packages. *Id.* However, we have interpreted the "for use in packaging" language broadly to include any equipment that is an "integral part" of the packaging process. For example, in *Hawthorn Mellody, Inc. v. Lindley* (1981), 65 Ohio St.2d 47, 52, 19 O.O.3d 234, 238, 417 N.E.2d 1257, 1261-1262, and *Kroger Co. v. Limbach* (1990), 53 Ohio St.3d 245, 246-247, 560 N.E.2d 192, 194, we held that conveyor systems which moved products to the packaging area qualified for the packaging exemption.

**{¶ 28}** In this case, the BTA made the appropriate finding that the case erectors are "an integral and essential part of a continuous packaging operation." The only question that remains is whether the case erectors do not qualify for the exemption solely because a portion of American National Can's packaging system is manual. Consistent with the language of the statute and our reasoning in

8

*Hawthorn Mellody*, *supra*, and *Kroger Co.*, *supra*, I believe that the exemption includes any equipment which is an "integral part" of the packaging process, regardless of whether the system is fully automated or not. As a result, I believe that the case erectors at issue are entitled to an exemption pursuant to R.C. 5739.02(B)(15).

III

{¶ 29} The last matter to which I dissent is the denial of an exemption for the electrical transformer. The applicable statute provides: "[A] construction contract pursuant to which tangible personal property is or is to be incorporated into a structure or improvement on and becoming part of real property is not a sale of such tangible personal property." R.C. 5739.01(B)(5). "Real property" is defined, in part, as: "all buildings, structures, improvements, and fixtures of whatever kind on the land." R.C. 5701.02(A).

{¶ 30} The majority misapplies a previous decision of this court when it concludes that because the transformer, which weighs 34,500 pounds, was not bolted to the property it did not meet the definition of "real property" set forth in R.C. 5701.02(A). The majority derives the "physical affixation" requirement from *Botkins Grain & Feed Co. v. Lindley* (1982), 1 Ohio St.3d 64, 1 OBR 105, 437 N.E.2d 1182. However, that case concerned livestock capsules which, as we noted, were highly portable: "In fact, a significant aspect of the marketability of these structures is their portability. They may be moved with a minimum amount of effort and no damage to the capsule or the pad." *Id.* at 65, 1 OBR at 106, 437 N.E.2d at 1183-1184. We also noted the potentially temporary, versus permanent, nature of the capsules: "The portability of the capsules is an especially attractive feature to tenant farmers as well as those farmers who intend to raise livestock for a relatively brief time." *Id.* at 65, 1 OBR at 106, 437 N.E.2d at 1184, fn.4. Consistent with the temporary nature of the capsules, this court found that without

physical affixation they could not qualify as real property. *Id.* at 68, 1 OBR at 108, 437 N.E.2d at 1186.

{¶ 31} The electrical transformer, unlike the livestock capsules, is more like a permanent improvement to American National Can's facility. In fact, it serves the necessary function of reducing the voltage received from an outside provider. The very nature of the transformer as a permanent and necessary element of American National Can's facility distinguishes it from the capsules at issue in *Botkins*, *supra*. See *Masheter v. Boehm* (1974), 37 Ohio St.2d 68, 66 O.O.2d 183, 307 N.E.2d 533, paragraph two of the syllabus. Furthermore, it would be elevating form over substance to require a 34,500 pound piece of equipment to be bolted to its concrete pad in order to qualify as "real property" for purposes of R.C. 5739.01(B)(5). The mere weight and permanent nature of the transformer make it so that it is at least "constructively affixed" and therefore qualifies as "real property." This conclusion is consistent with our decision in *Pittsburgh-Des Moines Steel Co. v. Lindley* (1982), 1 Ohio St.3d 15, 1 OBR 39, 437 N.E.2d 302, where we held that storage tanks which were similarly merely resting on foundations qualified as real property.

{¶ 32} For the foregoing reasons, I respectfully dissent.

———————————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 33} I concur in the majority's holdings that the water cooling system is exempt from taxation and that the electrical transformer is not exempt. I would have held, however, that the machine hoppers and case erectors are also tax exempt, and I therefore concur in Parts I and II of Justice Wright's concurring and dissenting opinion.

———————————